# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CALEB BARTLETT,<br><br>**Plaintiff,**<br><br>vs.<br><br>**PUSH TO WALK, TIFFANY WARREN, ABC CORPORATIONS #1-10, and JANE ROE #1-10,**<br><br>**Defendants.** | Civ. No. 2:15-cv-7167-KM-JBC<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

Plaintiff Caleb Bartlett, who is quadriplegic and uses a wheelchair for mobility, attended defendant Push to Walk fitness center for personal training. This action arises from an accident that occurred in May 2014. While trying a new training position with a Push to Walk employee, Mr. Bartlett experienced various symptoms, fell, and later discovered a leg fracture. Mr. Bartlett sues Push to Walk and the employee, claiming negligence, negligent hiring, and gross negligence. Now before the court is the defendants' motion for summary judgment. Defendants argue they are entitled to summary judgment on the two negligence claims, citing an exculpatory waiver that Mr. Bartlett signed and the charitable immunity doctrine. As to the claim of gross negligence, the defendants argue that the evidence is insufficient.

1

I.  **BACKGROUND**[1]

   **A. Factual History**

Caleb Bartlett, a thirty-six-year-old man who is quadriplegic, had been in a wheelchair for eighteen years and wished to improve his health. (PCSF ¶¶ 2, 5; RPCSF ¶¶ 2, 5). He suffered from low bone density, muscle atrophy, and digestive problems; he also wanted to lose weight. (PCSF ¶ 5; RPCSF ¶ 5). He sought personal training services from defendant Push to Walk to improve his condition. (PCSF ¶¶ 1, 5-6; RPCSF ¶¶ 1, 5-6).

Push to Walk "is a specialized gym for people with spinal cord injuries and neurological disorders." (PCSF ¶ 6; RPCSF ¶ 6). Push to Walk provides one-on-one workouts for $95 and other sessions for $50. (PCSF ¶ 40; RPCSF ¶ 40). Every client is billed monthly, must provide a valid credit card, and must pay $95 for any session cancelled with less than twenty-four hours' notice. (PCSF ¶ 40; RPCSF ¶ 40). Defendants allege that Mr. Bartlett, like many clients, raised funds from others, and did not pay out of pocket for his Push to Walk training sessions. (PCSF ¶ 40; RPCSF ¶ 40).

Tiffany Warren, an employee of Push to Walk, worked with Mr. Bartlett. (PCSF ¶¶ 15, 18; RPCSF ¶¶ 15, 18). As of May 2014, she held a Bachelor of Science degree in exercise science, had four years of experience at Push to Walk, was certified in CPR and AED, and was a certified personal trainer by the American School of Sports Medicine. (PCSF ¶¶ 7-8, 14; RPCSF ¶¶ 7-8, 14). She was not, however, a physical therapist. (PCSF ¶ 14; RPCSF ¶ 14).

Ms. Warren was hired by Push to Walk as an "aide," a position which involves assisting "neuroexercise trainers." (PCSF ¶ 9; RPCSF ¶ 9). She received on-the-job training from Push to Walk as an aide but was not provided with

---

[1]  Certain citations to the record are abbreviated as follows:
   Def. Ex. = Defendants' Exhibits (ECF No. 26, pp. 44-190)
   PCSF = Plaintiff's Counter-Statement of Facts (ECF No. 28, pp. 3-11)
   Bartlett Dep. = Deposition of Caleb Bartlett (ECF No. 28-3)
   RPCSF = Response to PCSF (ECF No. 32, pp. 3-7)

2

any written materials or videos to watch. (PCSF ¶ 10; RPCSF ¶ 10). After completing sixty on-the-job observation hours and seventy-five on-the-job "hands-on" hours, Ms. Warren began working as a "neuroexercise trainer." (PCSF ¶ 11; RPCSF ¶ 11). Other than those practical training hours at Push to Walk, Mr. Bartlett alleges, Ms. Warren did not receive any training to become a "neuroexercise trainer." (PCSF ¶ 13). Ms. Warren alleges, however, that she attended a seminar from Restorative Therapies in Baltimore, Maryland regarding advanced functional electrical stimulators. (RPCSF ¶ 13).

In April 2013, Ms. Warren began working with Mr. Bartlett. (PCSF ¶ 15; RPCSF ¶ 15). Bartlett claims that Warren did not perform Mr. Bartlett's initial assessment and did not know his height and weight at the time she began working with him. (PCSF ¶ 15). Warren responds that her failure to recall Bartlett's height and weight occurred only later, when she was deposed. (RPCSF ¶ 15). Ms. Warren's personal training services were supposed to "help improve [Mr. Bartlett's] bone density and to help get his body back in shape." (PCSF ¶ 17; RPCSF ¶ 17). Their sessions generally lasted an hour. (PCSF ¶ 18; RPCSF ¶ 18).

Sometime before the date of the accident, Mr. Bartlett requested to change trainers because he was "not comfortable" with what Ms. Warren "understood of spinal cord injury" and was "very surprised that she didn't understand about, specifically, ... autonomic [dysreflexia] and other conditions that can raise with spinal cord injury."[2] (PCSF ¶ 19). For Bartlett, Warren's alleged lack of understanding of autonomic dysreflexia "began to raise a red flag as to how much the staff really knew at Push to Walk about the intricacies of spinal cord injur[ies] and its secondary conditions ...." (PCSF ¶ 23; RPCSF ¶ 23).

---

[2] Autonomic dysreflexia is defined as "a disorder of spinal reflex activity occurring in those with spinal cord injury that is characterized by a sudden onset of hypertension, bradycardia, excessive sweating, and headache." *Autonomic Dysreflexia*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/medical/autonomic%20dysreflexia.

3

Mr. Bartlett recalls sending an email to Push to Walk employee Tommy Sutor about changing trainers approximately six months before the incident. The email, however, has not been produced. (PCSF ¶ 20; RPCSF ¶ 20). Bartlett also recalled having a telephone conversation with Sutor in which he explained that he was unhappy with Ms. Warren. (PCSF ¶ 21). He disapproved of her "behavior in certain situations" and explained, "I felt that she did not respect my years of experience with a chair and awareness of what my physical limitations were... I just felt it was disrespectful. It was a little bit condescending." (PCSF ¶ 21; RPCSF ¶ 21). Bartlett also felt that it would be "a better situation" if he worked with a male trainer. (PCSF ¶ 22; RPCSF ¶ 22). A few weeks before the accident, Sutor attempted to work out a schedule so that Bartlett could work with a different Push to Walk trainer. (PCSF ¶ 22; RPCSF ¶ 22).

On May 22, 2014, Mr. Bartlett was training with Ms. Warren at Push to Walk. (PCSF ¶ 24; RPCSF ¶ 24). Warren explained that she wanted to try a "kneeling" technique with Bartlett to improve his balance by isolating his core. (PCSF ¶ 24; RPCSF ¶ 24). She had been taught the "kneeling" technique by another trainer at Push to Walk; she was not sure of the trainer's name. (PCSF ¶ 25; RPCSF ¶ 25). She did not learn the technique anywhere else and had not read any material regarding this technique with respect to individuals with spinal cord injuries. (PCSF ¶ 26; RPCSF ¶ 26). Warren stated that "kneeling" had helped other clients improve their balance, but acknowledged that there was no "objective test for gauging improvement in balance." (PCSF ¶ 27; RPCSF ¶ 27). She was not concerned about "any risk at all" before putting Bartlett in the kneeling position because "[i]t was a gradual progression that he had gotten to after -- over a year of working out at Push to Walk." (PCSF ¶ 28; RPCSF ¶ 28).

Mr. Bartlett expressed that he was "nervous" about trying the kneeling position "because he had never been put in that position before," but "said he was willing to do it, to try it." (PCSF ¶ 29; RPCSF ¶ 29). He had not been in that

4

position since he had been injured; he told Ms. Warren that he had not knelt in over twenty years. (PCSF ¶¶ 30, 32; RPCSF ¶ 30, 32). Bartlett testified that he "made it very clear that [he] was not comfortable with the exercise." (PCSF ¶ 31; RPCSF ¶ 31). Warren allegedly said that he could stop if he felt uncomfortable. (PCSF ¶ 31). Bartlett admitted that "some part of" him wanted to be kneeling for the first time in twenty years because he did not "want to be a chicken" and was "willing to try." (PCSF ¶ 32; RPCSF ¶ 32). According to Bartlett, the Push to Walk employees:

> rotated me over onto my stomach, which was already uncomfortable because I had not laid on my stomach in ten years, and when you do that with a spinal cord injury, ... it's very painful and very uncomfortable. You're then pulled into a kneeling position backwards .... They grab you from behind by the hips and literally pull you back upward up in a kneeling position, and immediately when I was on my knees, it was much worse than when I was in the standing frame. I was lightheaded. There was some stronger dysreflexic symptoms. I knew that this was not a good situation. I could tell that they did not have control of my body, just because of my size, and I needed to lay down. I did not feel well and I asked them to put me down, and they did, and when I laid down, I was tingling, I was lightheaded and I was nauseous.

(PCSF ¶ 34). Warren then told him "I just want to try it one more time." (PCSF ¶ 34). Mr. Bartlett replied, "I don't think it's a good idea." (PCSF ¶ 34). He relented, however. Bartlett said, "All right. I'll do it one more time, but I don't think it's a good idea." (PCSF ¶ 34).

According to Mr. Bartlett, when the employees proceeded to get him in position, his hips buckled to the left, he fell forward to his right, and his hips went to the left. (PCSF ¶ 34). The employees righted him, but he felt that he was going to vomit, and they placed him down on the mat. (PCSF ¶ 34). Bartlett believed he had cracked a rib because he felt a pain shooting up his right side. (PCSF ¶ 34). He believes he was in the kneeling position for "no more than a minute" on the first attempt, and for less time than that on the second attempt. (PCSF ¶¶ 35-37; RPCSF ¶¶ 35-37).

5

Mr. Bartlett had never ended a training session early. (PCSF ¶ 34). He usually ended his training session on a positive note and would ride the electrical stimulation bicycle for a half hour. (PCSF ¶ 34). This time, however, Bartlett felt lightheaded and experienced early symptoms of dysreflexia. (PCSF ¶ 34). He was in pain and had a hard time breathing, particularly on his right side. (PCSF ¶ 34).

Mr. Bartlett's kneeling session with Ms. Warren was on Thursday, May 22, 2014. (Bartlett Dep. ¶¶ 90:17-21). The next day, Friday, Bartlett "sat very still all day" and his symptoms remained similar. (Bartlett Dep. ¶¶ 90:25-93:5). He experienced a growing pain on his right side and his breathing was labored; he thought he had cracked a rib. (Bartlett Dep. ¶¶ 91:2-8). He had mild sweats, was very tired, and lacked appetite. (Bartlett Dep. ¶¶ 91:8-15). By nighttime he was having bad spasms. (Bartlett Dep. ¶¶ 91:20-23). At 4:00 am on Saturday morning, Mr. Bartlett was experiencing spasms and shaking that were "similar to a panic attack"; he could barely breathe. (Bartlett Dep. ¶¶ 92:7-18). He thought he had a collapsed lung. (Bartlett Dep. ¶¶ 92:1-93:5).

Mr. Bartlett went to the hospital. (Bartlett Dep. ¶¶ 93:6-10). Although he did not have a cracked rib or blockages of any kind, his oxygen levels were very low. (Bartlett Dep. ¶¶ 93:11-23). The hospital performed X-rays and CAT scans of his upper body. (Bartlett Dep. ¶¶ 93:16-23). He continued to sweat and feel pain, and he was kept in the hospital for monitoring. (Bartlett Dep. ¶¶ 94:4-25).

After being discharged from the hospital, Mr. Bartlett noticed that his right knee and leg had started to swell. (Bartlett Dep. ¶¶ 94:21-95:6). He called his doctor sometime after the first week of June 2014; the doctor told him to go to Stony Brook University Emergency Room. (Bartlett Dep. ¶¶ 95:1-6, 97:19-21). The doctors at Stony Brook performed a series of MRIs and X-rays and determined that Mr. Bartlett had fractured his leg. (Bartlett Dep. ¶¶ 98:2-17). They determined that the leg had been fractured for at least three weeks. It had started to mend in a fractured position, such that it would

6

require dangerous surgery to repair. (*Id.*). The doctors decided not to perform surgery, however, because of the spinal cord injury. (Bartlett Dep. ¶¶ 98:-25). They put Mr. Bartlett in a brace and sent him home. (Bartlett Dep. ¶¶ 98:25-99:1). Bartlett states that this injury has prevented him from pursuing electronic stimulation and other types of physical therapy that have helped people with spinal cord injuries. (Bartlett Dep. ¶¶ 106:1-107:16). Since he has stopped exercising, his bone density has gotten lower and he has experienced increased pain in his hips and legs. (Bartlett Dep. ¶¶ 108:7-12).

### B. Pertinent Procedural History

Mr. Bartlett filed a complaint with this court on September 29, 2015, based on diversity jurisdiction. (ECF No. 1). The first complaint alleged two counts: negligence in providing services and the negligent hiring of defendant Tiffany Warren. (ECF No. 1). Defendants filed a motion for summary judgment on April 22, 2016. (ECF No. 11). Mr. Bartlett opposed this motion and also requested to file an amended complaint. (ECF Nos. 12, 13). I granted Mr. Bartlett's request to file an amended complaint and thus terminated the defendants' motion for summary judgment. (ECF No. 15).

On September 30, 2016, Mr. Bartlett filed an amended complaint that added a cause of action for gross negligence. (ECF No. 16). Defendants filed a motion for summary judgment on October 27, 2017. (ECF No. 26). Mr. Bartlett has filed papers in opposition (ECF No. 28), and the defendants have filed a reply (ECF no. 32)). The motion is fully briefed and ripe for decision.

### II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v.*

7

*County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

### III. DISCUSSION

Defendants Push to Walk and Ms. Warren claim they are entitled to summary judgment on the grounds of charitable immunity, an exculpatory waiver signed by Mr. Bartlett, and failure to meet the burden of establishing gross negligence. I address each count in turn: **(A)** negligence; **(B)** negligent hiring; and **(C)** gross negligence.

#### A. Count One: Negligence

Mr. Bartlett's negligence claim is barred by the exculpatory waiver he signed with Push to Walk. He signed a "Waiver and Release From Liability" form when he began training at Push to Walk. (Def. Ex. H-7). The relevant portion of the waiver provides as follows:

> Client waives, releases and discharges from any and all claims or liability for any loss, damage, theft or injury of any kind which arise out of or are related to Client's participation in, or its traveling to and from the Company's facilities including but not limited to: 1) any known and unknown, foreseen and unseen body and personal injury, 2) loss of life, and 3) any attorney's fees, costs, expenses, or charges sustained, directly or indirectly, or alleged to have been sustained, or in any fashion, arising from, in connection with, or resulting from its participation in the Company's programs or activities, even if due to the negligence of the Company or any employee, volunteer, director, officer, client, owner or agent thereof.

(Def. Ex. H-7).

Defendants state that Mr. Bartlett, by signing this form, has waived liability for any claim of negligence. Mr. Bartlett responds that the waiver is

9

unenforceable on public policy grounds. I repeat that in this point I am dealing with the waiver as it affects Count 1 (negligence) only.

As a general matter, "contracting parties are afforded the liberty to bind themselves as they see fit" and, "[o]ut of respect for that very basic freedom, courts are hesitant to interfere with purely private agreements." *Stelluti v. Casapenn Enters., LLC*, 1 A.3d 678, 688 (N.J. 2010) (citations omitted). Certain contracts, however, such as those that contain exculpatory clauses, "have historically been disfavored in law and thus have been subjected to close judicial scrutiny." *Id.*

As a threshold matter, like any waiver an exculpatory agreement must "reflect the unequivocal expression of the party giving up his or her legal rights that this decision was made voluntarily, intelligently and with the full knowledge of its legal consequences." *Gershon v. Regency Diving Center, Inc.*, 845 A.2d 720, 726 (N.J. Super. Ct. App. Div. 2004) (citation omitted). Ordinarily a written contract is sufficient to establish a knowing waiver: "When a party enters into a signed, written contract, that party is presumed to understand and assent to its terms, unless fraudulent conduct is suspected." *Stelluti*, 1 A.3d at 689. Here, Mr. Bartlett entered into a signed, written contract and there are no allegations that suggest fraudulent or misleading conduct regarding the waiver. I therefore find, as a threshold matter, that the exculpatory agreement expresses a voluntary waiver.

That is far from the end of the inquiry, however. Although New Jersey courts "do enforce contracts that contain exculpatory clauses," they will not do so if "such provision proves adverse to the public interest." *Stelluti*, 1 A.3d at 689 (citing *Mayfair Fabrics v. Henley*, 226 A.2d 602, 605 (N.J. 1967)).

Whether such an exculpatory provision violates public policy is evaluated under the *Gershon* test. *Id.* (citing *Gershon*, 845 A.2d at 727). *Gershon* held that an exculpatory agreement does not violate public policy and will be enforced if:

(1) it does not adversely affect the public interest;

10

(2) the exculpated party is not under a legal duty to perform;

(3) it does not involve a public utility or common carrier; or

(4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable.

*Id.* (citing *Gershon*, 845 A.2d at 727 (line breaks added)). I consider those four factors in order:

**(1)** Certain exculpatory waivers are plainly inconsistent with the public interest. For instance, the courts will not enforce a pre-injury release from liability for intentional or reckless conduct, or a release from a statutorily imposed duty. *See Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742, 751 (N.J. 2016); *Stelluti*, 1 A.3d at 689 (citing *Hojnowski v. Vans Skate Park*, 901 A.2d 381, 386-87 (N.J. 2006); *McCarthy v. NASCAR, Inc.*, 226 A.2d 713, 715 (N.J. 1967)). *See* (Def. Ex. H-7). A waiver that does either is void as "plainly inconsistent with public policy." Push to Walk's waiver, however, does neither of those things. I cannot find that this exculpatory clause, insofar as it releases a claim of simple negligence, is plainly inconsistent with public policy.

**(2)** The public-policy analysis "naturally blends into an examination of whether the exculpated party is under a legal duty to perform." *Stelluti*, 1 A.3d at 690. Exculpatory agreements that attempt to release liability for statutorily imposed duties have been held invalid. *Id.*; *see, e.g., McCarthy v. NASCAR, Inc.*, 226 A.2d 713 (N.J. 1967) (holding an exculpatory clause limiting liability at a car-racing event unenforceable because a statute regulated this field that expressed a public policy in protecting participants and spectators). The parties have not identified any statutorily imposed duty regarding such health clubs. *Cf. Stelluti*, 1 A.3d at 690-91 (failing to identify a statutorily imposed duty specific to private health clubs).

Even when the subject of an exculpatory agreement is not governed by statute, however, New Jersey courts have considered common law duties in weighing relevant public-policy considerations. *Id.* In the private setting, these common law duties are balanced against the right to freely agree to a waiver of a right to sue, which is part of the freedom to contract. *Id.*

11

Here, defendants surely had a duty of care. That duty is not unlimited, however. "When it comes to physical activities in the nature of sports—physical exertion associated with physical training, exercise, and the like—injuries are not an unexpected, unforeseeable result of such strenuous activity." *Id.* at 691. Such physical activities "require the participant to assume some risk because injury is a common and inherent aspect of the activity." *Id.* (citing *Crawn v. Campo*, 643 A.2d 600, 603 (N.J. 1994)). In *Crawn*, for example, the New Jersey Supreme Court held the standard of care due to individuals who participate in recreational sports "should not be based on a standard of ordinary negligence but on the heightened standard of recklessness or intent to harm." 643 A.2d at 605; *see also Schick v. Ferolito*, 767 A.2d 962, 968 (N.J. 2001) (upholding a recklessness standard regarding golf, finding "no persuasive reason to apply an artificial distinction between 'contact' and 'noncontact' sports" regarding the standard of care and the assumption of risk).

The New Jersey Supreme Court has found that private health clubs owe "a standard of care congruent with the nature of their business, which is to make available the specialized equipment and facility to their invitees who are there to exercise, train, and to push their physical limits." *Stelluti*, 1 A.3d at 694. Private health clubs may avoid liability for recklessness or gross negligence. *Id.* However, they can use exculpatory agreements to limit their liability regarding ordinary negligence, given that patrons assume at least some risk by engaging in physical recreational activity. *Id.*

In *Stelluti*, a participant in a spinning class at a private health center was injured when her handlebars dislodged from the bike. *Id.* at 681. The New Jersey Supreme Court found that the exculpatory agreement between the health center and the participant was valid as a pre-injury waiver of liability for negligence. *Id.* at 681, 694-95. To be sure, Mr. Bartlett's medical status and Push to Walk's specialty, serving injured individuals, inform the duty of care and may impose particular duties that an ordinary health club would not have. Still, as to the public policy issue, I think that *Stelluti* is sufficiently analogous.

12

*What* would constitute ordinary negligence would differ as between an ordinary health club and a facility like Push to Walk. But *whether* a claim for ordinary negligence can be waived should be governed by the *Stelluti* analysis.

I believe that Push to Walk's exculpatory waiver would not be deemed incompatible with public policy by New Jersey courts. Both cases involve instructors who allegedly failed to exercise due care regarding their client's exercise program. Thus, at least regarding allegations of ordinary negligence, Push to Walk and Ms. Warren are exculpated by the waiver signed by Mr. Bartlett.

**(3)** Push to Walk is not a public utility or a common carrier. Nor did it perform a necessary service akin to that provided by such an entity. This factor does not apply.

**(4)** Mr. Bartlett was not in a classic "position of unequal bargaining power" such that the contract must be voided. True, Push to Walk's agreement was a standard pre-printed form presented to patrons on a typical "take-it-or-leave-it basis." *See Stelluti*, 1 A.3d at 688. To that extent, it is a agreement of adhesion. *Id.* I will assume that Mr. Bartlett is a layperson without any specialized knowledge about contracts or exculpatory clauses. I will also assume, based on the record, that Push to Walk provides specialized services to individuals with spinal cord injuries—and that Mr. Bartlett had a particular interest in utilizing their services. Nonetheless, Mr. Bartlett could have attended another fitness club, found another means of exercise, worked with a physical therapist or medical professional or rehabilitation clinic, or declined to work with Push to Walk. *Cf. Stelluti*, 1 A.3d at 688 (finding that a prospective private gym member was not in a "position of unequal bargaining power" such that the waiver must be voided because she could have attended another gym or found another means of exercise). Mr. Bartlett does not allege that a time limit was imposed on his ability to review and consider whether to sign the agreement. *Cf. id.* Nor are there other allegations of procedural unfairness. In fact, there is good reason to think that Mr. Bartless, given his

13

specialized needs, would have given the contract more than usual scrutiny. In sum, the agreement is not void based on any notion of procedural unconscionability.

All four factors point to a conclusion that the exculpatory waiver clause is enforceable, and that it bars Mr. Bartlett from suing Push to Walk or Ms. Warren based on simple negligence. Summary judgment will therefore be entered in the defendants' favor on Count 1.[3]

### B. Count Two: Negligent Hiring

The parties appear to agree that Push to Walk's exculpatory waiver, if valid, would prevent Mr. Bartlett from maintaining a cause of action based on negligent hiring. (ECF Nos. 26, 28, 32). I nevertheless discuss it briefly.

The negligent hiring theory is used to impose liability "in cases where the employee commits an *intentional* tort." *Di Cosala v. Kay*, 450 A.2d 508, 515 (N.J. 1982) (emphasis added). New Jersey courts recognize the tort of negligent hiring "where the employe[r] either knew or should have known that the employee was violent or aggressive, or that the employee might engage in injurious conduct toward third persons." *Davis v. Devereux Found.*, 37 A.3d 469, 483 (N.J. 2012). The tort of negligent hiring has two fundamental requirements:

> The first involves the knowledge of the employer and foreseeability of harm to third persons. An employer will only be held responsible for the torts of its employees beyond the scope of the employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons. The second required showing is that, through the negligence of the employer in hiring the employee, the latter's

---

3     The distinct issue of respondeat superior is moot. Respondeat superior is based on the theory that the negligence of the employee (here, Ms. Warren) was committed in the scope of employment while she was acting at the agent of the employer (here, Push to Walk). *Di Cosala v. Kay*, 450 A.2d 508, 515 (N.J. 1982). The exculpatory clause, however, operates to bar a suit in negligence against either one.

14

incompetence, unfitness or dangerous characteristics proximately caused the injury.

*Di Cosala*, 450 A.2d at 516 (internal citations omitted). Based on the facts presented by Mr. Bartlett, Ms. Warren did not commit an intentional tort such as false imprisonment, battery, assault, intentional infliction of emotional distress, etc. *See Leang v. Jersey City Bd. of Educ.*, 944 A.2d 675, 698 (N.J. Super. Ct. App. Div. 2008), *judgment affirmed in part, reversed in part*, 969 A.2d 1097 (N.J. 2009) (listing intentional torts). Push to Walk cannot be held liable for negligent hiring if there was not an underlying intentional tort.

I will therefore enter summary judgment in favor of the defendants on Count 2.[4]

### C. Count Three: Gross Negligence

As to Count 3, I reach a different result. Summary judgment is denied regarding Mr. Bartlett's claims of gross negligence.

Gross negligence "falls on a continuum between ordinary negligence and recklessness, a continuum that extends onward to intentional conduct." *Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742, 753-54 (N.J. 2016). Gross negligence "is a higher degree of negligence, and undoubtedly denotes 'the upper reaches of negligent conduct.'" *Id.* (internal citation omitted). It is "commonly associated with egregious conduct." *Kain v. Gloucester City*, 94 A.3d 937, 947 (N.J. Super. Ct. App. Div. 2014).

> Whereas negligence is "the failure to exercise ordinary or reasonable care" that leads to a natural and probable injury, gross negligence is "the failure to exercise slight care or diligence." Although gross negligence is something more than "inattention" or

---

[4] I do not reach the issue of charitable immunity. If it applied, it would bar only an action for ordinary negligence, not gross negligence. *See* N.J. Stat. Ann. § 2A:53A-7 (a charity is not immune from torts involving "a willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature."). Counts 1 and 2, which allege ordinary negligence, have already been dismissed on other grounds. The immunity would not apply to Count 3, which alleges gross negligence.

15

> "mistaken judgment," it does not require willful or wanton
> misconduct or recklessness.

*Steinberg*, 142 A.3d at 754. According to New Jersey's model jury instructions, gross negligence "refers to a person's conduct where an act or failure to act creates an unreasonable risk of harm to another person because of the person's failure to exercise slight care or diligence." *Id.* (citation omitted). The model jury instructions also convey that gross negligence "is an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission." *Id.* at 754.

Summary judgment in a defendant's favor may be appropriate in a gross negligence case where there are no material disputes of fact and the conduct, even if negligent, was clearly not an egregious departure from the standard of reasonable care. In *Pulice v. Green Brook Sports & Fitness, LLC*, for example, the New Jersey Appellate Division upheld a grant of summary judgment for a defendant accused of negligence and gross negligence. No. L-1424-14, 2017 WL 3013086, at *1-3 (N.J. Super. Ct. App. Div. July 17, 2017). The plaintiff was injured at the health club when a ten-pound dumbbell fell on her face as her trainer, whom she hired through the club, was handing it to her. *Id.*[5] The Appellate Division observed that gross negligence requires "indifference to consequences," "may be equated with willful or wanton conduct," and involves a "reckless disregard for the safety of others." The court found that the facts would not support a finding that plaintiff's injury was the result of gross negligence by defendants. *Id.* at *3. *See also Mario Basile v. Leisure Village West*, No. L-776-13, 2016 WL 5417871, at *1 (N.J. Super. Ct. App. Div. Sept. 29, 2016) (In personal injury case, it was perhaps negligence, but not gross negligence, for a condo to delay in responding to a complaint that a tree stump posed a tripping hazard).

---

[5] As in this case, that plaintiff had signed an exculpatory waiver and release when she joined the club, and the court held it effective to bar a claim of ordinary negligence. *Id.* at *1–*2.

16

On the other hand, summary judgment is not appropriate where there are disputes of material fact or it is not clear that the defendant's conduct failed to rise to the level of gross negligence. In *Steinberg v. Sahara Sam's Oasis, LLC*, for example, the New Jersey Supreme Court overturned a grant of summary judgment on a gross negligence claim. 142 A.3d 742, 755-57 (N.J. 2016). Plaintiff, a patron of defendant's water park, suffered a catastrophic spinal cord injury on a surfboarding water ride. *Id.* at 744. Defendant allegedly failed to post warning signs, failed to instruct patrons on how to safely ride the simulated surfboard, failed to properly train its employees regarding safety procedures, and failed to comply with the mandates of the New Jersey Carnival-Amusement Rides Safety Act. *Id.* at 745. A pre-injury exculpatory release was held to effectively waive the plaintiff's ordinary negligence claim. *Id.* at 751. Nonetheless, the court found that, viewing the record in the light most favorable to the plaintiff, a reasonable factfinder could find that the plaintiff's injuries were proximately caused by the gross negligence of the water park. *Id.* at 756. "[A] factfinder could conclude that by not implementing the safety features of the 2008 operator's manual and not giving the plaintiff the necessary safety instructions, [defendant water park] failed to exercise slight care or diligence or demonstrated an extreme departure from the standard of reasonable care." *Id.* at 757. *See also Mone v. Gaziadei*, No. A-4578-15T2, 2017 WL 5076472 (N.J. Super. Ct. App. Div. Oct. 30, 2017) (in thirteen-year-old softball player's suit for injuries to face, denying summary judgment in light of a material dispute as to whether the coach had instructed the plaintiff to wear full equipment during off-field warmup as catcher).

I cannot find that the record is so-one sided that the case law standards require a verdict for the defendant on the issue of gross negligence. The issue of gross negligence is highly dependent on the context. The context here is that the plaintiff, as defendants surely knew, was highly vulnerable and that he was relying on their expertise to avoid injury. After his first kneeling attempt did not go well, they pressed him to try it a second time, and injury resulted. The case

17

law does not permit me to conclude that a rational jury could not find gross negligence here. Drawing all all inferences in favor of the plaintiff, I must deny the defendants' motion for summary judgment on Count 3, the gross-negligence claim.

### IV.  CONCLUSION

For the foregoing reasons, summary judgment is granted for defendants on Counts 1 and 2, which allege negligence and negligent hiring. Summary judgment is denied on Count 3, which alleges gross negligence.

An appropriate order accompanies this opinion.

Dated: April 9, 2018

**KEVIN MCNULTY**
**United States District Judge**